**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

Jeffrey Bragg,

             **Plaintiff,**          **Civil Action No. 11-10579**

        **vs.**               **District Judge Robert H. Cleland**

Commissioner of            **Magistrate Judge Mona K. Majzoub**
Social Security,

            **Defendant.**

_____/

**REPORT AND RECOMMENDATION**

Plaintiff Jeffrey Bragg seeks judicial review of Defendant the Commissioner of Society Security's determination that he is not entitled to social security disability benefits. (Dkt. 1.) 42 U.S.C. § 405(g), 42 U.S.C. § 1383(c). Before the Court are the parties' motions for summary judgment. (Dkt. 10, 11.)

The Court has been referred these motions for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Dkt. 3.) The Court has reviewed the pleadings, dispenses with a hearing, and is now ready to issue its report and recommendation.[1]

**I.      Recommendation**

Because substantial evidence supports the ALJ's denial of Plaintiff's benefits request and the ALJ did not commit an error worthy of remand when he did not discuss the treating physician's report, the Court recommends denying Plaintiff's motion for summary judgment, granting

_____

[1]The Court dispenses with a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f)(2).

1

Defendant's motion for summary judgment, and therefore dismissing this case.

**II      Report**

     **A.      Facts**

          **1.      Procedural background**

On April 7, 2008 Plaintiff filed for a period of disability and disability insurance benefits, alleging that he became disabled on March 31, 2008.  On July 11, 2008 his claim was denied. Plaintiff filed a written request for a hearing.  He appeared and testified at a hearing held on February 9, 2010. (AR at 12.) The ALJ denied Plaintiff's disability benefits request. (*Id.*) Plaintiff requested review of the ALJ's decision; the Appeals Council denied Plaintiff's request. (*Id*. at 1.) Plaintiff then filed this case, seeking judicial review of Defendant's final decision. (Dkt. 1.)

          **2.      Plaintiff's medical evidence, testimony, and vocational expert testimony**

               **a.      Medical evidence**

Plaintiff focuses his motion on, and alleges that he is disabled primarily due to, his back pain. The origin of this back pain comes from an accident Plaintiff had when he tripped over his dog and fell on March 29, 2008.  Two days later, on March 31, 2008 Plaintiff went to the St. John Oakland Hospital emergency room because he was experiencing back pain from his fall.  (AR at 150.)

At St. John, an internal medicine physician examined Plaintiff. The doctor found that Plaintiff generally was "alert and oriented," "in no apparent distress," "well-nourished," and that Plaintiff had "good muscular tone."  (*Id.*)  The doctor noted that Plaintiff had "some palpatory tenderness" in the area in which Plaintiff hurt his back–the lumbar region. (AR at 159.) The doctor also noted that Plaintiff did not experience any "significant pain" over the thoracolumbar junction (lower back region). (*Id.*)  The doctor recorded that Plaintiff had full range of motion in his bilateral

upper extremities and full strength in his bilateral wrists, bilateral elbows, and bilateral shoulders. (*Id.*)  The doctor further recorded that Plaintiff was not experiencing associated radicular type symptomatology.  (*Id*. at 159.)

The doctor reported that Plaintiff had degenerative disk disease throughout the cervical spine. (AR at 159.)  The doctor did not note any evidence of fracture and noted that Plaintiff maintained well-preserved disk spaces.  (*Id.*)  But the doctor stated that there were some compression deformities that were chronic in nature in some areas.  (*Id.*)  The doctor then summarized that Plaintiff exhibited "[n]o significant pain on clinical examination."  (*Id.*)

In April, 2008 Plaintiff consulted the Macomb Orthopedic Surgeons.  (AR at 167.)  Dr. Munk, the surgeon, stated that Plaintiff complained of lower back pain, but that that pain was not reproduced by palpation.  (*Id*. at 167.)  Dr. Munk noted that Plaintiff had a normal straight leg raising test.  (*Id.*)  Dr. Munk put Plaintiff in a restrictive corset and stated that he would see Plaintiff back in six weeks' time.  (*Id.*)  Dr. Munk also noted that Plaintiff's pain was "very mild in nature and [that] he should do well with conservative treatment[.]" (*Id.*)

In August, 2008 a report stated that Plaintiff was alert and had a normal attention span, and that he was oriented to person, place, and time.  (AR at 226.)  The report also noted that Plaintiff had his memory intact, although he experienced some difficulty with remote memory.  (*Id.*)  That report also showed that Plaintiff had no abnormal movements and "5/5" strength in all extremities "both proximally and distally, except some proximal weakness on extension."  (*Id.*)  And the report noted that he had a "[n]ormal gait and stance."  (*Id*. at 227.)

A January, 2009 medical report showed that Plaintiff had chronic low back pain.  (AR at 213.)  But that report also shows that Plaintiff was "able to sit, stand and ambulate without

assistance, and look[ed] steady on his feet." (*Id*. at 217.)

In February, 2009 Plaintiff was admitted to St. John Oakland Hospital for chest pain. (AR at 187.) In that report, the doctor noted that Plaintiff had "chronic back pain" that did "not radiate to lower extremities." (*Id*. at 190.)

A May, 2009 visit reveals that Plaintiff stated that his lower back pain was increasing. (AR at 230.) The report shows that Plaintiff stated that his pain worsened with walking and decreased with bed rest. (*Id.*) The pain also increased when he bent down. (*Id.*) But Plaintiff did not say that he had any pain radiating to his hips or thighs. (*Id.*) In May, he had a normal gait, was able to walk on his toes, heels, and tandem walk with mild difficulty. (*Id.*) He again had "5/5" power. (*Id.*) He was also able to lift his legs up to a ninety degree angle before he experienced any pain. (*Id*. at 232.) The report included a vicodin plan and required Plaintiff to "[a]void lifting heavy weights." (*Id.*) The report requested that Plaintiff return in six months for a follow-up visit. (*Id.*)

On July 24, 2009 Plaintiff visited his alleged primary care physician, Dr. Praveena Mungara. (AR at 197.) In the report, Dr. Mungara reported that Plaintiff's main concern was his back pain, because the pain interfered with Plaintiff's activities." (*Id.*) Dr. Mungara noted that she would decrease Plaintiff's vicodin because Plaintiff was not tolerating it well. (*Id*. at 199.)

In September, 2009 Plaintiff visited Dr. Mungara again. (AR at 292.) She noted that Plaintiff's lifting/carrying was affected by his lower back pain. (*Id*. at 290.) Dr. Mungara filled out a social security attending physician's statement. In that statement, she wrote that Plaintiff could carry ten pounds. (*Id.*) She based this assessment off of the MRI. (*Id.*) She also wrote that Plaintiff's standing and walking were affected, basing her opinion on Plaintiff's reported pain and the MRI. (*Id.*) Dr. Mungara also wrote that Plaintiff's back pain did not affect his ability to sit. (*Id*.

at 291.)  In this report, Dr. Mungara 'checked' boxes indicating that Plaintiff could "[n]ever": climb, balance, stoop, crouch, kneel, or crawl.  (*Id*. at 291.)  She did not explain her findings.  (*Id.*)  She also indicated that Plaintiff's speech, handling, and pushing/pulling were affected by his impairment, citing his abnormal MRI.  (*Id.*)  Dr. Mungara indicated that Plaintiff should not expose himself to heights or moving machinery.  (*Id*. at 292.)  As an explanation, she wrote that Plaintiff had pain while at rest.  (*Id.*)  She also indicated that Plaintiff required "complete freedom to rest frequently without restriction." (*Id*. at 293.)  She found that Plaintiff needed to lie down repeatedly or for a substantial period of time during the day.  (*Id.*)  But she also indicated that Plaintiff was able to reach and pick, pinch, or otherwise work with his fingers.  (*Id.*)

### b.    Plaintiff's 288 work history report and 2009 information sheet

Plaintiff filled out a work history report in April, 2008.  (AR at 118.)  Plaintiff's statements in this report contradict his later testimony at his hearing.  In this report, he stated that he did run errands, because he was the only person with a license.  (*Id*.)  He stated that he had no problems taking care of his personal care needs (dressing, bathing, feeding, etc.).  (*Id*. at 199.)  He did admit, though, that taking care of these needs took longer to complete than before he sustained his injury. (*Id.*)  He checked boxes that he did not need any special reminders to take care of himself or to take any medications.  (*Id*. at 120.)  He stated that he prepared all of his own meals.  (*Id.*)  He also stated that he went outside daily, and he traveled by walking and driving a car.  (*Id*. at 121.)  He got around by himself, he stated.  (*Id.*)

He shopped for himself, in stores.  (AR at 121.)  This shopping, he stated, he did weekly and took him two hours to complete.  (*Id.*)

As for social activities, Plaintiff stated that he did not spend a significant amount of time with

people, other than his girlfriend, with whom he interacted daily.  (AR at 122.)

On the report, he also stated that he was able to pay attention for a long time and followed written directions "very well" and spoken directions "not too bad."  (AR at 123.)  He added that he handled stress "not too bad" and handled changes in routine "ok."  (*Id.* at 124.)

In September, 2009 Plaintiff filled out a claimant's information sheet.  (AR at 144.)  In this sheet, he indicated that he used a cane to get around.  (*Id.* at 143.)  But he also stated that he was able to do housework and repairs around the home.  (*Id.*)  He also listed "fishing" as a hobby.  (*Id.* at 144.)  While he did write that could only walk one block, sit and stand for ten minutes, each, and lift only five pounds, he also wrote that he could dress and feed himself and take care of his own personal needs.  (*Id.*)

### c.      Plaintiff's testimony

At his hearing, Plaintiff stated that his lower back was his most disabling condition.  (AR at 33.)  He stated that he was in constant pain and that his back prevented him from sitting for very long or even taking a shower.  (*Id.*)  Although he related that he had always had a bad back, he stated his back issues worsened when he tripped over his dog and fractured several lumbar vertebrae.  (*Id.*)  Plaintiff stated that the pain was not alleviated by medication and sometimes radiated up his back. (*Id.* at 35.)  Plaintiff added the he sometimes fell, as well.  (*Id.*)

Plaintiff also stated that he had difficulty sleeping at night–due to pain and worrying.  (AR at 34.)

Plaintiff stated that his second most disabling condition related to his stroke, which occurred in either May 2008 or 2009 (Plaintiff could not remember when he suffered his stroke).  (AR at  35-36.)  The stroke, Plaintiff stated, made it difficult for him to hold onto objects and affected his

balance.  (*Id*. at 36.)  He also stated that his stroke affected his ability to write.  (*Id*. at 35.)

Plaintiff recounted how his memory had worsened since the stroke–to the point where he could no longer remember dates, and he sometimes forgot where he placed things.  (AR at 36-37.)

Plaintiff stated that he did not do any chores around the house and that he did not partake in any social or recreational activities on a regular basis; but he stated that he was able to go to the grocery store and do a week's worth of shopping with a friend.  (*Id.*)

Plaintiff stated that he did not believe that he could perform at a job that required him to sit or stand, pick up small parts, arrive on time, and spend eight hours a day there for five days a week.  (AR at  38-39.)  When asked why he could not do the job, Plaintiff stated that his back hurt so much that he ends up lying down or sleeping for five to six hours a day.  (*Id*. at 39.)  He stated that he could only sit for ten minutes before he had to move around or stand up.  (*Id*.)  And he stated that he could stand for the same amount of time.  (*Id*. at 41.)  He alleged that he could not even walk a block, had trouble lifting anything over three pounds, and if he lifted any more than that, he experienced severe back pain.  (*Id.*)

Plaintiff stated that his back hurt so much that he was not able to get up as quickly as he used to and that he could no longer cook.  (AR at 40.)  He stated that he was depressed.  (*Id.*)  He added that he was unable to concentrate or write, and that his "memory [was] history."  (*Id*. at 41.)

### d.    Vocational expert testimony

The ALJ examined a vocational expert about Plaintiff.  (AR at 42.)  The majority of the ALJ's examination involved him posing hypothetical examples about whether Plaintiff would be able to perform certain jobs given certain restrictions.  The vocational expert also questioned Plaintiff about his alleged limitations and abilities.

The ALJ posed several hypothetical examples to the vocational expert.  The ALJ asked the vocational expert whether a person capable of "lifting to 20 pounds occasionally, ten pounds frequently, again standing, sitting and walking six hours, occasional ramps and stairs, occasional balancing, stooping, crouching, kneeling and crawling and no climbing ladders, ropes or scaffolds" could perform Plaintiff's past relevant work as an event coordinator.  (AR at 48.)  Given these limitations, the vocational expert testified that Plaintiff could perform his past work as an event coordinator, and that such jobs existed in the economy.  (*Id*.)

The ALJ then posed another hypothetical.  The ALJ reduced the exertional limitations of lifting to ten pounds, and stated that the hypothetical person could not do any repetitive reaching, climbing, balancing, stooping, crouching, kneeling, or crawling, and the person would have to avoid concentrated exposure to heights and moving machinery and jobs that would allow the person to rest with complete freedom.  (AR at 48.)  The vocational expert stated that, if Plaintiff had these limitations, he could not perform his past work as an event coordinator because she was not aware of any employer that would allow an employee to have complete freedom to rest.  (*Id.*)

### e.      The ALJ's decision

The ALJ analyzed Plaintiff's claim under the five step sequential analysis.  The ALJ found that Plaintiff satisfied the first two factors–for Plaintiff did not engage in substantial gainful activity during the period of his alleged disability onset date through the date he was last insured and Plaintiff suffered from a severe impairment.  (AR at 14-15.)  The ALJ found that Plaintiff had the following severe impairments: history of cerebrovascular accident; hypertension; hyperlipidemia; degenerative disc disease; history of lumbar fracture; history of prostate cancer status post prostatectomy; obstructive sleep apnea; history of alcoholism, and a major depressive disorder. (*Id*.

at 14.)  But the ALJ stated that these impairments did not meet or medically equal a listed impairment in 20 C.F.R. § 404, Subpart P, Appendix 1.  (*Id.*)

The ALJ first summarized his finding that Plaintiff did not suffer from a physical impairment.  (AR at 14.)  He stated that there was "no evidence of neuro-anatomic distribution of pain, limitation of motion of the lower back, motor loss accompanied by sensory or reflex loss or positive straight leg raising in both sitting and supine positions so as to meet the criteria of Listing 1.04."  (*Id.*)

The ALJ then discussed Plaintiff's alleged mental impairments.  (AR at 15.)  The ALJ held that Plaintiff did not have a mental impairment that met or medically equaled Listing 12.04.  (*Id.*) To hold so, the ALJ analyzed the medical evidence under the "Paragraph B" criteria.[2]

The ALJ held that Plaintiff had no daily living restrictions during the relevant time period. (AR at 15.)  He held that, although Plaintiff testified that he needed help with his personal care,

---

[2] These factors are the factors that 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00 Mental Disorders requires Defendant to analyze when determining whether a claimant's mental disorder is severe and limits the claimant's ability to perform substantial gainful activity. Paragraph C requires Defendant to assess the claimant's functional limitation using four criteria: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.*  For Section 12.04 affective disorders, the requisite severity is met when the claimant shows that he has two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration. *Id.* at 12.04(B). A plaintiff can also meet the 12.04 listing by establishing the 12.04 Paragraph C criteria: "Medically documented history of a chronic affective disorder or at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: 1. Repeated episodes of decompenstaion, each of extended duration; or 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." *Id.* at 12.04(C).

9

Plaintiff had also reported, in May, 2008, that he was "independent in all personal care, albeit, "slower." (*Id*.) In May, 2008 the ALJ also stated that Plaintiff reported that he did all the cooking; and in June, that he had a "high level of independent functioning." (*Id.*) The ALJ found that, even into 2009, there was evidence, in February, that he only had mild limitation with daily activities, and in September, Plaintiff "indicated independence in dressing and feeding himself as well as tending to all his own personal needs generally." (*Id.*.)

As to social functioning, the ALJ found that Plaintiff had mild difficulties. (AR at 15.) Although the ALJ noted that Plaintiff had little or no social interaction, the ALJ found that the record did not suggest that Plaintiff's lack of social interaction was due to any psychologically based symptoms. (*Id.*) The ALJ added that Plaintiff spent time with his 'ladyfriend,' daily, and that Plaintiff was able to go out grocery shopping. (*Id.*)

The ALJ found that Plaintiff had moderate difficulties with concentration, persistence, and pace. (AR at 15.) The ALJ noted that, during his examination of Plaintiff, Plaintiff appeared alert and exhibited normal attention. (*Id.*) The ALJ found that Plaintiff was oriented as to person, place, and time, and that his memory was intact, although he experienced some remote memory difficulty. (*Id.*) But the ALJ pointed out that by May, 2009, Plaintiff tested normal for comprehension, repetition, naming, and fluency on a neurological examination, and that Plaintiff was able to recall three of three objects after five minutes. (*Id.*) The ALJ found that Plaintiff therefore did have some moderate limitations relating to concentration, persistence, or pace. (*Id.*)

Because Plaintiff did not present with two "marked" limitations, the ALJ found that Plaintiff did not satisfy the Paragraph B criteria. (AR at 15.)

The ALJ also reviewed the Paragraph C criteria, and found that Plaintiff did not satisfy that

10

paragraph's criteria.  (AR at 15.)

The ALJ then calculated Plaintiff's RFC.  The ALJ determined that Plaintiff had the residual functional capacity to perform light work, as defined by 20 C.F.R. § 1567(b), with some limitations: lifting no more than twenty pounds occasionally and ten pounds frequently; sitting, standing, and walking, no more than six hours each; no climbing ladders, ropes, or scaffolds; and only occasional balancing, stooping, kneeling, crouching, and crawling.[3]  (AR at 16.)

The ALJ reasoned that Plaintiff's statements about his ability to walk to be somewhat unreliable, finding that Plaintiff stated he could walk as long as he had his cane, and then later stated that he could not walk even a block.  (AR at 16.)

The ALJ acknowledged that a March, 2008 emergency room report showed that Plaintiff went to the emergency room stating he had significant pain in his lumbar region.  (*Id.*)  An April, 2008 MRI confirmed that Plaintiff had a lumbar fracture.  (*Id.*)  The ALJ noted that although the MRI revealed several injuries, in March, Plaintiff had waited two days before he went to the emergency room.  (*Id.*)  The ALJ also pointed out that Plaintiff had used a cane at the hearing in June, 2010, but that Plaintiff had stated that he had only started  using the cane the previous year, and not immediately after his back injury.  (*Id.*)  And the ALJ finally noted that, in June, 2008, Plaintiff was reported to have a "high level of independent function."  (*Id.*, citing Ex. 6F at 64.)

_____

[3]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weight up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 1567(b).

The ALJ also pointed out that, in March, 2008, Plaintiff had an examination that indicated that he had experienced some spinal tenderness, but there was no report of significant pain.  (*Id.*)

The ALJ recognized that an x-ray of Plaintiff's spine did reveal degenerative disk disease throughout the cervical spine.  (*Id.*)

The ALJ also noted Plaintiff's "minor" stroke and that Plaintiff received a favorable prognosis for improving his speech and language.  (AR at 18.)

The ALJ addressed both Plaintiff's prior tachycardia hospital incident as well as Plaintiff's prior intubation for respiratory failure and pneumonia.  (AR at 19.)  During the intubation, Plaintiff did experience some minor pain in his face, but the ALJ noted that that pain and examination was inconsistent with Plaintiff's current claim of ongoing, disabling symptoms since the alleged onset date.  (*Id.*)  That February, 2009 report showed that Plaintiff had good strength "throughout both upper extremities" as well as good or normal results in other areas of his body.  (*Id.*)  The ALJ also noted that the report showed that Plaintiff could walk two-hundred feet with an IV pole without any "ambulatory devices" and "with minimal assistance with the physical therapist."  (*Id.*)  The report indicated that Plaintiff's balance was "mildly decreased and he had a slow gait," but that he was "steady" overall. (*Id.*)

The ALJ noted that an April, 2009 report indicated that Plaintiff's gait was normal.  (AR at 19.)  And in May, 2009 a report indicated that although Plaintiff may have shown an indication of spinal damage (his right toe went up when stimulated by a reflex test, indicating possible spinal damage, but his left toe did not react similarly), Plaintiff was still able to walk on his toes, heels, and could tandem walk (heel to toe walk) with only mild difficulty.  (*Id.*)  That report showed that Plaintiff's tone and bulk were normal in the upper and lower extremities bilaterally, and that sensory

12

examination was normal, as well.  (*Id.*)  The ALJ noted that, although Plaintiff stated that he was not able to write since his stroke, May, 2009 treatment notes show that Plaintiff had "full power in his upper extremities."  (*Id.*)

Despite Plaintiff's low back pain complaints, the ALJ found that a July, 2009 physical examination countered those complaints.  (AR at 18.)  The examination was "unremarkable with no swelling, weakness, or muscle spasm."  (*Id.* )  And Plaintiff, at that examination, was able to raise his legs straight.  (*Id.*)

The ALJ pointed out other instances of Plaintiff making inconsistent statements about matters relating to Plaintiff's disability.  (AR at 18.)   These statements included conflicting statements of Plaintiff's alcohol use and abuse.  (*Id.*)

The ALJ found that Plaintiff's testimony was not credible about his mental health.  (AR at 18.) The ALJ noted that Veteran's Administration Hospital document reports of Plaintiff indicate that he began exhibiting depression symptoms in March, 2008, and that these symptoms continued into 2009.  (*Id.*)   But the ALJ noted that Plaintiff consistently denied suicidal and homicidal thoughts, and although initially reporting a decrease in appetite, he later reported that his appetite was good.  (*Id.*)  The ALJ stated that Plaintiff self-discontinued his anti-depressant medication and was described only as "mildly depressed."  (*Id.*)

The ALJ also pointed out statements that were inconsistent with Plaintiff's testimony that he lay down for five to six hours a day to manage his pain.  (AR at 18.)  The ALJ noted that Plaintiff "described daily activities [that] [were] not limited to the extent one would expect," including "housework and repairs around the home" and "hobbies includ[ing] fishing."  (*Id.*)  The ALJ further stated that "[i]t bears repeating that the medical evidence also reference to independence in daily

13

activities in 2008 and 2009." (*Id.*)

The ALJ concluded: "Lastly, the residual functional capacity conclusions reached by the consultant employed by the State Disability Determination Services also supported a finding of not disabled . . . . Although the consultant was non-examining, and therefore the opinion does not as a general matter deserve as much weight as those of examining or treating physicians, the opinion does deserve some weight, particularly in a case like this in which there exists a number of other reasons to reach similar conclusions[.]" (AR at 20.)

Although the ALJ found that Plaintiff was capable of performing past relevant work as an events coordinator, he also found other jobs in the economy existed that Plaintiff would be able to perform. (*Id.*)

**B.     Standard of review**

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review under this statute is limited to determining whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner's decision employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

14

In determining the existence of substantial evidence, the Court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### 1.      Framework For Social Security Disability Determinations

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

1. he was not presently engaged in substantial gainful employment; and
2. he suffered from a severe impairment; and
3. the impairment met or was medically equal to a "listed impairment;" or
4. he did not have the residual functional capacity to perform his relevant past work.

*See* 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f). If Plaintiff's impairments prevented him from doing his past work, the Commissioner, at step five, would consider his residual functional capacity ("RFC"), age, education and past work experience to determine if he could perform other work. If he could not, he would be deemed disabled. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,*

15

820 F.2d 777, 779 (6th Cir. 1987) (citation omitted).  This "substantial evidence" may be in the form

of vocational expert testimony in response to a hypothetical question, "but only 'if the question

accurately portrays [the claimant's] individual physical and mental impairments.'"  *Id.* (citations

omitted).

### C.     Analysis

Plaintiff first argues that the ALJ did not appropriately address his treating source, Dr.

Mungara.  (Pl.'s Mot. for Summ. J. at 10.)  Plaintiff then argues that substantial evidence did not

support the ALJ's RFC.  (*Id.* at 14.)          Defendant argues that the ALJ's failure to explicitly

discuss Dr. Mungara's opinion is not an error worthy of remand and that substantial evidence

supports the ALJ's decision.  (Def.'s Mot. for Summ. J. at 7, 5.)  The Court agrees with Defendant.

### 1.     The ALJ's failure to address the treating source's opinion does not require remand

Plaintiff first argues that the ALJ erred by not addressing a Dr. Mungara's opinion.  (Dkt.

10, Pl.'s Mot. for Summ. J. at 10.)  Plaintiff alleges that Dr. Mungara was a treating physician and

that, as a treating physician, the ALJ was required to address the opinion.  (*Id.*)  Dr. Mungara's

opinion, Plaintiff argues, contradicts the ALJ's determination that Plaintiff could lift twenty pounds

and sit or stand for six hours at a time.  (*Id.*)

Even assuming that Dr. Mungara was a treating physician, the Court is satisfied that the

treating opinion is patently deficient and that the ALJ implicitly addressed the treating opinion.

The Commissioner has imposed "certain standards on the treatment of medical source

evidence."  *Cole v. Astrue*, –F.3d–, 09-4309, 2011 WL 5456617, at *4 (6th Cir. Sept. 22, 2011)

(citing 20 C.F.R. § 404.1502).  Under the treating source rule, the ALJ must "give a treating source's

opinion controlling weight if it is 'well-supported by medically acceptable clinical and laboratory

16

diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Id*. (citing 20 C.F.R. § 404.1527(d)(2)).  If the ALJ does not give controlling weight to the treating source's opinion, he "must then balance the following factors to determine what weight to give it:" "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Id*. (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) and 20 C.F.R. § 404.1527(d)(2)).

The Commissioner requires its ALJs to "always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion."  *Id*. (citation omitted).  "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Id*. (citation omitted).

The Sixth Circuit has "made clear" that it will remand the Commissioner's determination if it has not provided good reasons for the weight it has given to a treating physician's opinion.  *Id*. at *10 (citing *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)).

If the ALJ fails to follow an agency rule or regulation, then the ALJ's failure "denotes a lack of substantial evidence, even where the [ALJ's conclusion] may be justified based upon the record." *Id*. at *3 (citation omitted).

But a failure to follow the treating source rule can be deemed "harmless" if the "treating source's opinion is so patently deficient that the Commissioner could not possibly credit it[.]" *Id*. (citation omitted).  "An opinion may be patently deficient if the treating source offers no explanation to support it." *Fleming v. Comm'r of Soc. Sec.*, 10-25, 2011 WL 3049146 at *9 (E.D.Tenn. July 5,

17

2011) (citing *May v. Astrue*, 09-00090, 2009 WL 4716033 at *8 (S.D.Ohio Dec. 9, 2009) (finding treating source opinion patently deficient where treating source simply checked boxes about the plaintiff's alleged disability and failed to provide supporting explanations or objective evidence."). *See also Sisk v. Astrue*, 09-220, 2010 WL 3522307 at *10 (E.D.Tenn. Aug. 20, 2010) (holding that the ALJ's written decision met the goal of the treating source rule when the decision attacks the consistency of the treating source's opinion with other record evidence or the supportability of that opinion, for example, by pointing to an absence of clinical and diagnostic findings; and citing *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-72 (6th Cir. 2006)). The ALJ must show "at least implicitly" why he "rejected" the treating source's opinion. *Id.*

Here, the treating source's opinion that Plaintiff relies upon is patently deficient. In September, 2009, Plaintiff visited Dr. Mungara. (AR at 292.) Dr. Mungara noted that Plaintiff's back pain affected his ability to lift and carry things. (*Id*. at 290.) Dr. Mungara wrote that Plaintiff could carry ten pounds. (*Id.*) She based this assessment off of the MRI. (*Id.*) She also wrote that Plaintiff's back pain affected his standing and walking. (*Id.*) Dr. Mungara also wrote that Plaintiff's back pain did not affect his sitting. (*Id*. at 291.) In this report, Dr. Mungara 'checked' boxes indicating that Plaintiff could "[n]ever": climb, balance, stoop, crouch, kneel, or crawl. (AR at 291.) She did not explain her findings. (*Id.*) She also indicated that his back pain affected his speech, handling, and pushing/pulling, citing his abnormal MRI. (*Id.*) Dr. Mungara indicated that Plaintiff should not expose himself to heights or moving machinery. (*Id*. at 292.) As an explanation, she wrote that Plaintiff had pain while at rest. (*Id.*) She also indicated that Plaintiff required "complete freedom to rest frequently without restriction." (*Id*. at 293.) She found that Plaintiff needed to lie down repeatedly or for a substantial period of time during the day. (*Id.*) But she also indicated that

18

Plaintiff was able to reach and pick, pinch, or otherwise work with his fingers.  (*Id.*)

Despite Dr. Mungara's findings, she offered no objective evidence on how she came to her conclusions.  She merely checked boxes and wrote "MRI" and, in one section, "pain" as the reasoning for her conclusion that Plaintiff was disabled.  Dr. Mungara's findings are patently deficient–she offered no insight into her conclusion.

Defendant also points out that Dr. Mungara's treatment notes of Plaintiff also contradict her ultimate recommendation.  (Def's Mot. for Summ. J. at 9-10.)  On February 26, 2009 and July 24, 2009 Plaitniff saw Dr. Mungara.  (AR at 274, 197.)  From those visits, Dr. Mungara noted that Plaintiff had no weakness, muscle spasms, or swelling in his extremities and that his straight-leg raising test was normal.  (*Id.* at 276, 198.)  These notes therefore do not support Dr. Mungara's very restrictive assessment of Plaintiff.

Because Dr. Mungara's opinion is not supported by her own notes and is patently deficient, the ALJ's failure to discuss that opinion explicitly is harmless to the ALJ's analysis.  And for the reasons stated in the next section, the Court finds that substantial evidence supported the ALJ's RFC calculation and ultimate determination.

### 2.    Substantial evidence supports the ALJ's RFC

Plaintiff next argues that the ALJ's RFC determination of Plaintiff was inconsistent with the impairment that the ALJ found that Plaintiff suffered.  (Pl.'s Mot. for Summ. J. at 14.)  Plaintiff alleges that the ALJ listed no objective medical evidence to justify the RFC determination.  (*Id.*)  Plaintiff then alleges that the ALJ's RFC determination "is flawed on its face because of the limitations in the RFC are contradictory to the severe impairments found in step 2."  (*Id.*)

The ALJ found that, through the date Plaintiff was last insured, Plaintiff had the residual

19

functional capacity to perform light work with the following limitations: lifting no more than twenty pounds occasionally and ten pounds frequently; sitting, standing, and walking, no more than six hours each; no climbing ladders, ropes, or scaffolds, and only occasional balancing, stooping, kneeling, crouching, and crawling.  (AR at 16.)  The ALJ also found that, mentally, Plaintiff could perform semi-skilled work, which involves some skills but does not involve doing the more complex work duties.[4]  (*Id.*)

Here, substantial evidence supports this RFC.  The record contains evidence that, although Plaintiff experienced pain from his fall, Plaintiff retained full range of motion and strength in his upper extremities.  (AR at 150.)  The record also contains evidence that, in April, 2008, Plaintiff had normal straight leg raising test results and was prescribed conservative treatment plans.  (*Id*. at 167.)  And in August, 2008, evidence shows that Plaintiff had no abnormal movements, a normal gait and stance, and "5/5" strength in his upper extremities, with only "some proximal weakness on extension."  (*Id*. at 226-27.)  In January, 2009 Plaintiff complained of low back pain, but was able to sit, stand, and ambulate without assistance, and looked steady on his feet.  (*Id*. at 217.)  In May of that year, Plaintiff had a normal gait, and was able to walk on his toes, heels, and tandem walk with only mild difficulty; he again had "5/5" strength.  (*Id.* at 230.)  At that visit, Plaintiff was cautioned to avoid lifting "heavy weights."  (*Id.*)

This brief summary of evidence, therefore, is more than a scintilla of evidence that the ALJ relied upon to calculate the RFC.  The Court finds the ALJ's determination is supported by substantial evidence.

---

[4]Plaintiff, in his motion, does not present any evidence that contradicts the ALJ's RFC with respect to his mental condition; the Court therefore only notes that substantial evidence supports that Plaintiff's mental condition has not disabled him.

**D.**      **Conclusion**

For the above-stated reasons, the Court recommends denying Plaintiff's motion for summary

judgment, granting Defendant's motion for summary judgment, and therefore dismissing this case.

**III.**   **Notice to parties**

The parties to this action may object to and seek review of this report and recommendation,

but are required to file any objections within fourteen days of service, as provided for in Federal

Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).   Failure to file specific objections

constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard*

*v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filling objections that raise

some issues but fail to raise others with specificity will not preserve all the objections a party might

have to this report and recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390,

401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.

1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection

must recite precisely the provision of this report and recommendation to which it pertains.  Not later

than fourteen days after service of an objection, the opposing party may file a concise response

proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2). Local Rule 72.1(d).

The response must specifically address each issue raised in the objections, in the same order, and

labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the court

determines that any objections are without merit, it may rule without awaiting the response.

Dated: January 23, 2012                s/ Mona K. Majzoub_____
                                         Mona K. Majzoub
                                         United States Magistrate Judge

## **PROOF OF SERVICE**

       I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: January 23, 2012                s/ Lisa C. Bartlett\_\_\_
                                         Case Manager